AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
05/15/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: EC DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
May 15, 2025
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY /s/ Nancy Boehme
Deputy Clerk, U.S. District Court

United States of America

v.

ALEXANDER G. RAMOS,
  aka "Alejandro Gerardo Ramos Cisneros,"
  aka "Alex Ramos,"

Defendant(s)

Case No. 8:25-mj-00404

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 10, 2020, in the county of Orange in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Dana M. Wrathall
Complainant's signature

Dana M. Wrathall, Special Agent FBI
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: May 15, 2025

Judge's signature

City and state: Santa Ana, California

Hon. Douglas F. McCormick, U.S. Magistrate Judge
Printed name and title

KF:bm

**AFFIDAVIT**

I, Dana M. Wrathall, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2016. I am currently assigned to the Orange County Resident Agency ("OCRA") of the Los Angeles Field Office. At OCRA, I am assigned to the complex financial crime squad tasked with investigating corporate fraud, securities fraud, cyber-enabled investment and cryptocurrency frauds, and money laundering. During my career as an FBI SA, I have received both formal and informal training from the FBI and other institutions on investigating complex financial crimes, including corporate and securities fraud schemes, and the forensic analysis of digital devices. I have experience in conducting witness interviews, analyzing financial records, and executing search and arrest warrants. Because of my training and experience, I am familiar with federal laws concerning mail fraud, wire fraud, and money laundering.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of an arrest warrant and criminal complaint charging ALEXANDER RAMOS ("RAMOS"), also known as ("aka") "Alejandro Gerardo Ramos Cisneros" and "Alex Ramos," with wire fraud, in violation of Title 18, United States Code, Section 1343.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and any dates and times are on or about those dates and times.

### III. STATEMENT OF PROBABLE CAUSE

#### A. OVERVIEW

4. The FBI has been investigating allegations that RAMOS, through his positions as either Title and Risk Department Manager or Assistant Vice President of Risk Management at Victim Company,[1] caused checks to be issued from Victim Company to certain parties, including One Stop Insurance in Las Vegas, Nevada ("One Stop"). These checks were ostensibly to cover expenses related to tax, titling, and licensing ("TTL"). However, RAMOS caused too many funds to be sent to those recipient entities, and RAMOS would direct the recipient entities, including One Stop, on the disposition of the extra funds, including sending funds to bank accounts that he controlled.

5. The FBI reviewed financial records for RAMOS and discovered approximately $7 million in checks and wires

---

[1] Victim Company is a privately held finance company based in Newport Beach, California. Victim Company specializes in finances specifically for the purchase of classic and collector cars.

deposited into financial accounts controlled by RAMOS from title agents or other entities in the car industry, like One Stop. A review of the origin of some of these funds that were deposited into RAMOS's accounts showed the checks or wires were made out to Victim Company and intended as refunds to Victim Company clients who had overpaid for vehicle registration fees in various jurisdictions around the United States. However, instead of being returned directly to Victim Company, the funds deposited into RAMOS's accounts were subsequently moved to other accounts controlled by RAMOS before being used for his own personal gain, such as to purchase a home in Irvine.

**B. BACKGROUND ON VICTIM COMPANY**

6. Victim Company is a private lending company located in Newport Beach, California. The company makes loans for the classic and collector car industry.

7. In many of Victim Company's transactions, Victim Company assists its clients, who are car purchasers, with registering the cars they purchased and paying applicable TTL expenses. Victim Company's clients are from across the United States and may wish to register their cars in different states, including in California. However, different states can have different processes and TTL fees, so Victim Company would reserve about eight percent of the purchaser's loan with Victim Company for possible TTL expenses and work with title agents or other partner entities to register their clients' purchased cars.

## C. BACKGROUND ON RAMOS'S ROLE

8. RAMOS had been employed at Victim Company since approximately 2017 until his termination around September 2024. Since 2018, RAMOS had served as either the Title and Risk Department Manager or Assistant Vice President of Risk Management at Victim Company. Through his positions, RAMOS had knowledge of Victim Company's loans and held relationships with title agents or other partners used by Victim Company around the United States. RAMOS also oversaw requests by the Title and Risk Department to the Accounting Department for payment to title agents, on specific occasions submitting the requests himself.

9. When RAMOS was hired by Victim Company in 2017, Victim Company had established relationships with two national registered agents[2] for service. These national agents were large corporations who had departments specializing in titling vehicles in different states. RAMOS also established relationships with approximately 17 smaller title agents in various states and started using them for Victim Company transactions. Each of these independent title agents had their own process of invoicing Victim Company for their services. As a result, the process by which Victim Company sent titles and payment for TTL fees in other states outside California depended on the specific agent.

---

[2] One of them, for example, was CSC Global. CSC Global is a U.S. corporation that provides, among many other services, motor vehicle title management services in multiple jurisdictions across the United States.

**D. RAMOS FUNNELED TTL FUNDS FROM VICTIM COMPANY TO ONE STOP DURING COVID SHUTDOWNS**

10. Between January 22, 2025, and May 6, 2025, the FBI interviewed representatives of Victim Company about Victim Company's relationship with One Stop and learned the following:

   a. S.K. was employed as the Vice President and General Counsel at Victim Company.

   b. B.T. was employed as the Vice President of Operations at Victim Company. B.T. was RAMOS's immediate supervisor.

   c. N.H. was employed as the Vice President and Controller at Victim Company. N.H. oversaw the Victim Company's Accounting Department.

   d. B.P. was employed as the Title Supervisor at Victim Company. B.P. reported directly to RAMOS in the Title and Risk Department.

   e. Between in or around January 2020 through in or around September 2020, Victim Company needed a solution to have vehicles registered for their customers despite DMVs for many states being closed due to the COVID-19 pandemic. Victim Company, as the lender, needed its position as the lien holder registered on a purchased vehicle's title, which could not be done due to the many DMV closures.

   f. RAMOS presented One Stop to Victim Company as a solution. According to RAMOS, One Stop could handle the registrations through the Nevada DMV, which RAMOS claimed was still open. Victim Company understood from RAMOS that One Stop

would arrange for a "title only" transaction and obtain a temporary registration for the purchaser to use on their vehicle.[3] Victim Company believed it could protect its security interest on its issued loans by engaging One Stop's services as RAMOS proposed.

   g. RAMOS then caused $1.8 million of TTL funds, including for non-Nevada purchasers, to be sent to One Stop by Victim Company between in or around January 2020 through in or around July 2020.  N.H. thought it did not make sense that money allocated for state taxes for non-Nevada residents would be sent to One Stop but did not question RAMOS.

  11. On February 13, 2025, FBI Task Force Officer Michael Kim ("TFO Kim") interviewed Marcio Silva Andrade ("ANDRADE"), owner of One Stop, and learned the following:

   a. One Stop's relationship with Victim Company began in 2020, shortly before the COVID-19 pandemic started.  ANDRADE only worked with RAMOS from Victim Company.

   b. ANDRADE received checks from Victim Company to register vehicles and pay sales tax in Nevada.  Each check detailed the purchaser(s) for whom the funds were intended to cover.  Once he received the check, ANDRADE would register the car and pay sales tax in Nevada.  ANDRADE indicated that the titles often had issues, such as missing signatures.  Whenever he encountered those issues and could not get a vehicle

---

[3] A review of One Stop invoices sent to Victim Company during this timeframe show service fees for "DMV Services – per title," "DMV Services – per temp tag," and "DMV Services – per 30 day pass."

registered, ANDRADE sent the money back to Victim Company but kept his service fee of a few hundred dollars.

        c.    ANDRADE returned money back to Victim Company through wire transfers because RAMOS said it was easier than sending refund checks. ANDRADE sent the refunds to Victim Company using a routing number and bank account number provided by RAMOS. The bank information provided by RAMOS led ANDRADE to send funds to a BBVA account ending in 3720 ("BBVA3720").

        d.    ANDRADE thought it was strange that Victim Company sent One Stop such large amounts of money and was worried because it was a lot of money that did not belong to him. ANDRADE told RAMOS to stop sending large amounts because he had to return it back to Victim Company. RAMOS assured ANDRADE this was normal.

    **E.**    **RAMOS REQUESTED $52,143 BE SENT TO ONE STOP FOR TTL FOR VICTIM COMPANY'S CUSTOMERS**

12.    On March 28, 2025, pursuant to legal process, I obtained business records from Victim Company, including emails from RAMOS to Victim Company's Accounting Department. The emails showed RAMOS, using his work email address, requesting on numerous dates between January 2020 to July 2020 for TTL money be sent to One Stop.

        a.    Specifically, on June 29, 2020, RAMOS requested that Victim Company's Accounting Department "issue a check in the amount of $52,143.00 to One Stop for TTL related to" a list of Victim Company's customers provided in the email, including B.B., C.C., and L.P.

   b. Victim Company subsequently issued a check, bearing check number 35226, to One Stop in the amount of $52,143.00. A copy of the cleared check provided by Victim Company to the FBI showed the check was deposited into a US Bank account ending in 3817 ("USB3817"), which I believe is associated with One Stop, on July 6, 2020.

  13. On April 30, 2025, I interviewed B.B. of Chicago, Illinois, and learned the following:

   a. B.B. purchased a vehicle using Victim Company as the lender in June 2020. The TTL fees financed as part of the loan totaled $6,421.

   b. B.B. thought his sales tax money would go to Illinois because he was an Illinois resident. B.B. assumed Victim Company handled the payment of sales tax to Illinois.

   c. B.B. had temporary tags for the vehicle that expired after 30 days. B.B. had not yet received the vehicle registration for Illinois and contacted Victim Company. Victim Company blamed the COVID-19 pandemic and Illinois's DMV being shut down. Victim Company then offered to register B.B.'s vehicle through another state.

   d. Victim Company conveyed to B.B. it would be quicker to register the vehicle in Montana. Victim Company then facilitated the creation of a Limited Liability Company ("LLC") for B.B. in Montana. B.B. received physical Montana license plates with registration paperwork in the mail from Montana. B.B. kept the vehicle registered in Montana for the year before moving the registration to a state where B.B. had residency.

   e. B.B. never requested titling or registration in Nevada.  B.B. never authorized TTL funds be sent to One Stop or anyone else in Nevada, nor was B.B. ever made aware the funds were sent there.  B.B. had never heard of One Stop.

   f. B.B. never received a refund from Victim Company for any overage money related to TTL fees.

   g. B.B. could not remember who at Victim Company handled the Montana registration on his behalf.

  14. On May 1, 2025, I interviewed C.C. of Brentwood, Tennessee, and learned the following:

   a. C.C. purchased a vehicle using Victim Company as the lender in June 2020.  The TTL financed as part of the loan totaled $4,755.

   b. C.C. did not remember making a specific request to Victim Company regarding the vehicle's registration, but assumed the vehicle would be registered in Tennessee, where C.C. had residency.

   c. C.C. received Montana license plates for the vehicle with registration paperwork showing an LLC had been created in Montana in C.C.'s name.  The license plate was a permanent plate made of metal.

   d. C.C. was perplexed and caught off guard by this.  C.C. was unhappy and sent some emails to Victim Company about it.  Victim Company ultimately transferred C.C.'s vehicle registration from Montana to Tennessee after several months.  C.C. had to continually follow up with Victim Company for several months to have the transfer finalized.

   e. C.C. never requested titling or registration in Nevada.  C.C. never authorized TTL funds be sent to One Stop or anyone else in Nevada, nor was C.C. ever made aware the funds were sent there.  C.C. had never heard of One Stop.

   f. C.C. never received a refund from Victim Company for any overage money related to TTL fees.

   g. C.C. dealt with RAMOS at Victim Company when he escalated his complaints about the Montana registration.  C.C. never authorized RAMOS to personally receive any of the TTL money from his loan.

 15. On May 1, 2025, I interviewed L.P. of Centralia, Illinois, and learned the following:

   a. L.P. purchased a vehicle using Victim Company as the lender in June 2020.  The TTL financed as part of the loan totaled $6,108.

   b. L.P. requested and expected Illinois registration for the vehicle.  L.P. received a Montana title and registration instead but was not concerned about this.  L.P. later sold the vehicle to another party with the Montana title.

   c. L.P. said the Montana registration was "automatic."  L.P. learned an LLC had been set up for him in Montana upon receiving Montana license plates and LLC paperwork in the mail.

   d. L.P. provided me a copy of an email exchange between himself and Victim Company's employees.  RAMOS was included on the emails but was not the originator of the email thread.  The email subject line read, "IL Registration

Requirements – Loan # 348220," and contained instructions for L.P. to send Victim Company specific forms and information so Victim Company could complete L.P.'s registration in Illinois. The first email was time stamped June 16, 2020, at 1:47 p.m., and the last email was time stamped June 19, 2020, at 4:49 p.m. At no point in the communications did Victim Company suggest or offer Nevada or Montana registration to L.P.

      e.  L.P. never requested titling or registration in Nevada.  L.P. never authorized TTL funds be sent to One Stop or anyone else in Nevada, nor was L.P. ever made aware the funds were sent there.  L.P. had never heard of One Stop.  L.P. had also not authorized TTL funds to be sent to Montana, but L.P. had decided to leave it alone after it happened.

      f.  L.P. never received a refund from Victim Company for any overage money related to TTL fees.

    16.  On January 14, 2025, pursuant to legal process, I obtained financial records from PNC Bank associated with bank accounts that I believe are controlled by RAMOS.  One of the accounts was the BBVA3720 account discussed earlier, to which ANDRADE wired money intended as refunds to Victim Company.  The account statements for BBVA3720 show RAMOS as the account holder and a mailing address of 63 Fanlight, Irvine, CA 92620.[4] Evidence in these records show that RAMOS received numerous wire transfers between January 2020 to July 2020 from One Stop's

---

[4] Based on my knowledge of this investigation, I know this to be RAMOS's address up to approximately July 2020.  I also know this address was not associated with Victim Company at any time.

account, USB3817, into BBVA3720, for example a wire sent following the deposit of Victim Company's check (discussed earlier) into USB3817: 7/10/2020 – Incoming wire, ORG 1 STOP INSURANCE - $45,000.00.

17. Analysis of BBVA3720's incoming funds showed that One Stop was the primary source of funds into BBVA3720 during the time period beginning in or around January 2020 to July 2020.

18. Analysis of BBVA3720 did not show transactions related to Victim Company's legitimate business, including payment of TTL fees in Nevada or Montana.

19. On or about July 21, 2020, RAMOS issued check no. 729 in the amount of $380,000 to payee "ALEXANDER RAMOS" from BBVA3720. A copy of the cleared check shows a handwritten endorsement and a bank stamp reading "JPMorganChaseBank 073106 740917 947110076531."

20. On December 30, 2024, pursuant to legal process, I received financial records from JP Morgan Chase Bank ("Chase") associated with bank accounts belonging to RAMOS. One of the accounts was Chase account ending in x2927 ("JPMC2927"). Statements for JPMC2927 show RAMOS as the account holder with mailing address 63 Fanlight, Irvine, CA 92620.

    a. The July statement for JPMC2729 shows a deposit on July 31, 2020, of check no. 729 for $380,000.00 from BBVA3720.

21. Analysis of JPMC2927 did not show transactions related to Victim Company's legitimate business, including payment of TTL fees in Nevada or Montana.

### F. INTERSTATE WIRE TRANSFERS

22. Based on my review of wire information from One Stop's account, USB3817, into BBVA3720, I understand that the wire transfers were accomplished using the Fedwire Funds Service.

23. Based on a document from Fedwire that I reviewed, I understand that since 2009, Fedwire has used servers in Texas and New Jersey, and that the servers in both states are employed to finalize wire transfers using the Fedwire service.

### IV. CONCLUSION

24. For all the reasons described above, there is probable cause to believe that RAMOS engaged in a scheme to defraud and used interstate wire communications to facilitate that scheme, in violation of Title 18, United States Code, Section 1343.

/s/
Dana M. Wrathall
Special Agent, Federal Bureau of Investigation

Subscribed to and sworn before me this 15th day of May 2025.

HONORABLE DOUGLAS MCCORMICK
UNITED STATES MAGISTRATE JUDGE